ITT CONTINENTAL BAKING
COMPANY, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent,

TED BATES & COMPANY,
INC., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 356, Docket 75-4141.

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1976.

Decided March 1, 1976.

John H. Schafer, III, Washington, D. C. (Lawrence M. McKenna, New York City, Stephen C. Rogers, Washington, D. C., and Gordon A. Thomas, Rye, N. Y., on the brief), for petitioner ITT Continental Baking Co., Inc.

Marshall Cox, Washington, D. C. (Donald J. Mulvihill, Laurence T. Sorkin, Cahill, Gordon & Reindel, Washington, D. C., and Elhanan C. Stone, New York City, on the brief), for petitioner Ted Bates & Co., Inc.

Denis E. Hynes, Washington, D. C. (Robert J. Lewis, Gen. Counsel, Gerald Harwood, Assistant Gen. Counsel, and James P. Timony, Washington, D. C., on the brief), for respondent Federal Trade Commission.

Donovan, Leisure, Newton & Irvine, Mahlon F. Perkins, Jr., and Thomas R. Trowbridge, III, New York City, on the brief, for American Association of Advertising Agencies, Inc. as amicus curiae.

Before ANDERSON, FEINBERG and MULLIGAN, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

These are petitions to review an order of the Federal Trade Commission (Commission or FTC) requiring that the petitioners, ITT Continental Baking Co., Inc. (ITT Continental) and Ted Bates & Company, Inc. (Bates), cease and desist from making various types of nutritional claims in advertising food products.[1] The cease and desist order was predicated on the Commission's finding that, in a series of advertisements, ITT Continental and Bates, its advertising agency, violated §§ 5 and 12 of the Federal Trade Commission Act by falsely representing ITT Continental's product, "Wonder Bread", to be "an extraordinary food for producing dramatic growth in children." The petitioners claim that the Commission's finding of a violation was both procedurally defective and unsupported by the record. They also claim that, even on the basis of the finding itself, the Commission's cease and desist order is too broad and vague to be sustained.[2] For the reasons hereinafter stated, we affirm the Commission's order as to the violation found but modify the cease and desist portions thereof.

I.

Although there is evidence that American consumers do not pay much attention to nutritional content when purchasing bread,[3] for many years the advertisers of Wonder Bread apparently operated on the contrary assumption; and petitioner Bates used the nutritional qualities of Wonder Bread as that product's "unique selling proposition"[4] in the advertisements it helped develop for ITT Continental. In particular, the petitioners ran two advertising campaigns em-

1. These petitions, originally filed in this court but transferred to the Court of Appeals for the District of Columbia Circuit because of a prior filing in that Court of a petition to review the same FTC order, have been re-transferred here following dismissal of the prior petition, *Consumer Federation of America v. FTC*, 169 U.S. App.D.C. 136, 515 F.2d 367 (1975).

2. Petitioner Bates also objects to the absence of a "knew or had reason to know" clause in the order against it, see *infra*.

3. ITT Continental's vice president in charge of marketing and advertising testified in the FTC proceedings about various studies which so indicated.

4. "A unique selling proposition is an advertising claim concerning a product which is thought to be strong enough to cause customers to buy the product about which the claim is made rather than a rival product. To be unique the proposition must be one that the competition either cannot, or does not, offer." Stipulation of the parties, before the FTC, Commission Exhibit 174.

phasizing Wonder Bread's nutritional value which formed part of the basis for the FTC proceedings here reviewed. The first, referred to as the "Wonder Years" campaign, took place between 1964 and 1970, and featured, *inter alia*, television [5] commercials referring to the "Wonder Years—ages one through twelve—when your child actually grows to ninety percent of his adult height" and enumerating the "vital elements" found in Wonder Bread "for growing minds and bodies." [6] The second campaign, which ran in 1970 and 1971, involved the so-called "How Big" commercials, which typically portrayed responses of several children to the question, "How big do you want to be?"—*e. g.*, "Big enough to ride a two-wheeler"—and suggested that the viewer could help "by serving nutritious Wonder Bread." [7] The television commercials in both campaigns generally contained what the petitioners refer to as a "fantasy growth sequence," a visual insert in which, "through some unexplained filming technique," a small child is shown growing to the size of a 12-year-old in a few seconds.

The above-described advertisements were aimed mainly at women between 18 and 49 years of age with children below the age of 18,[8] but "substantial numbers" of children

5. The campaigns also included advertisements on radio and in newspapers and magazines.

6. A typical commercial from this campaign was described by the Commission as follows:
"[Petitioners'] 60-second commercial entitled 'Cardboard House' . . . depicts several young children playing in a cardboard house. The commercial opens with the announcer stating:
These are the 'Wonder Years,' the formative years one through twelve when your child develops in many ways, actually grows to 90% of her adult height.
. . . . .
To help make the most of these 'Wonder Years,' serve nutritious Wonder Enriched Bread. Wonder helps build strong bodies 12 ways. Carefully enriched with foods for body and mind, Wonder Bread tastes so good, and it is so good for growing child, for active adult.
While the announcer is talking, the TV screen shows a child eating Wonder Bread and then actually growing rapidly from a very young child to a twelve-year-old. While this visual rapid growth is taking place before the viewer's eyes, first the word 'protein,' then 'mineral,' then 'carbohydrates,' and finally 'vitamins,' are flashed in rapid succession above the growing child, each one coinciding with each growth sequence depicted. This visual depiction of the child growing while eating Wonder Bread appears twice in the 60-second commercial. When it appears the second time, the announcer asserts that 'each slice of bread supplies protein for muscle, minerals for strong bones and teeth, carbohydrates for energy, vitamins for nerves, all vital elements for growing minds and bodies.' The commercial ends with the announcer urging parents:
to help make the most of her 'Wonder years,' her growth years, serve Wonder

Bread. Wonder helps build strong bodies 12 ways."
Opinion of Commission, at 5–6 (ellipsis in original; footnote omitted).

7. The Commission and the Administrative Law Judge described several of the commercials from this campaign as follows:
"These commercials open showing a young child with 'HOW BIG DO YOU WANT TO BE?' over-printed. The announcer says, 'Wonder asks, how big do you want to be?' Various children answer as they are photographed:
'Big enough so that the barber won't have to cut my hair in a baby's chair,' 'Big enough to be a cheerleader,' 'Big enough to sink a basket,' 'Big enough to touch the ceiling myself,' 'Big enough to dance with my girlfriend,' 'Big enough to go surfing,' 'Big enough to wear my daddy's shoes,' 'Big enough to see the parade,' 'Big enough to ride a two-wheeler,' 'About ten times bigger than my sister,' 'Big enough to reach things without a chair,' and 'Bigger than George, he's my dog.'
After the children have told how big they want to be, the announcer states:
He'll never need Wonder Bread more than right now, because the time to grow bigger and stronger is during the Wonder Years— ages one through twelve—the years when your child grows to ninety percent of his adult height.
During this audio message, the same Wonder Years visual growth sequence is used. . . ."

Opinion of Commission, at 6–8 (footnote omitted.)

8. Counsel for the Commission in their brief contend that the commercials were shown on children's programs as well but the Commission's opinion was to the contrary and it is supported by evidence in the record.

were stipulated to be in the viewing audience as well.[9] In addition, the petitioners presented on children's television programs advertisements for Wonder Bread which were specifically directed at children. For example, on the "Captain Kangaroo" show, the host was portrayed discussing with "Mr. Moose" the latter's goals concerning physical growth, and, while conceding that Wonder Bread would not cause Mr. Moose to grow "*quite* as big as a tree," the Captain asserted that "Wonder *does* help boys and girls grow up big and strong . . . ."[10] These commercials did not contain the so-called fantasy growth sequence.

On August 24, 1971, the FTC issued a complaint against the petitioners alleging that their Wonder Bread advertisements were false, misleading, deceptive, and unfair in several different respects. The complaint also contained allegations relating to advertisements for another group of ITT Continental's products, "Hostess Snack Cakes," which allegations were ultimately dismissed and are irrelevant for purposes of this review except possibly insofar as the fact of their dismissal bears on the reasonableness of the Commission's cease and desist order, to be considered *infra.* The crucial allegations concerning Wonder Bread were contained in paragraphs eight, ten, and eleven of the complaint. Paragraph eight charged that the petitioners had represented, "directly and by implication," that:

"(a) . . . Wonder Bread is an outstanding source of nutrients, distinct from other enriched breads.

9. There was testimony that up to 26% of the Wonder Bread television "impressions" were received by children, as compared with 26% going to women between 18 and 49 years of age.

10. The following audio sequence is typical of the commercials shown on the Captain Kangaroo show:

"Captain Kangaroo: Mr. Moose, I have an interesting question for you. If you could be as big as you wanted to be . . . how big would you want to be?
Mr. Moose: Gee . . . as big . . . as big . . . I know. As big as a tree. Then I could see *everything* around me for miles and miles.

(b) Consuming . . . Wonder Bread in the customary manner that bread is used in the diet will provide a child age one to twelve with all the nutrients, in recommended quantities, that are essential to healthy growth and development.

(c) Parents can rely on Wonder Bread to provide their children with all nutrients that are essential to healthy growth and development.

(d) The optimum contribution a parent can make to his child's nutrition during the formative years of growth is to assure that the child consumes Wonder Bread regularly.

(e) The protein supplied by said Wonder Bread is complete protein of high nutritional quality necessary to assure maximum growth and development."

Paragraph ten alleged:

"Certain of the [Wonder Bread] advertisements are addressed primarily to children or to general audiences which include substantial numbers of children, which advertisements tend to exploit the aspirations of children for rapid and healthy growth and development by falsely portraying, directly and by implication, . . . Wonder Bread as an extraordinary food for producing dramatic growth in children.
\*      \*      \* "

Paragraph eleven alleged:

"Certain of the [Wonder Bread] advertisements are addressed primarily to parents of children or are addressed to gen-

Captain Kangaroo: Wouldn't that be fun, Mr. Moose.
Mr. Moose: Yes. Do you think eating Wonder Bread would get me that big?
Captain Kangaroo: Well . . . not *quite* as big as a tree . . . but Wonder does help boys and girls grow up big and strong, and give them energy for work and play. Each slice of Wonder is baked with vitamins and other good things that help you grow.
\*      \*      \* "

Opinion of Commission, at 8–9 (footnote omitted).

Similar advertisements were also shown on "Bozo Circus," another children's program broadcast in Chicago.

eral audiences which include substantial numbers of parents of children, which advertisements tend to exploit the emotional concern of such parents for the healthy physical and mental growth and development of their children by falsely portraying, directly and by implication, Wonder Bread as a necessary food for their children to grow and develop to the fullest extent during the preadolescent years.

\* \* \* "

For the most part the petitioners admitted that Wonder Bread did not have the nutritional qualities alleged to have been claimed for it in the challenged advertisements, but they denied that the advertisements represented that the bread did have those qualities. The case turned, therefore, on the meaning of the Wonder Bread advertisements themselves. In his opening remarks to the Administrative Law Judge before whom the case was initially tried, the Commission's complaint counsel announced that primary reliance would be placed on the Commission's own expertise in interpreting what advertising says or implies, but that expert testimony and documentary evidence would also be presented on the question of people's actual perception of the challenged commercials. In the evidence introduced by complaint counsel were the results of several surveys of consumer attitudes toward Wonder Bread and other brands of bread, including one series of inquiries which attempted directly to measure the effect of some of the challenged advertisements on consumers and which also elicited "verbatim responses" as to their recollections of the content and message of particular Wonder Bread commercials.[11] Experts for both sides testified as to their analyses of one or more of the studies in question; in addition both sides presented expert opinions on how viewers would perceive the challenged advertisements.

Although some of the evidence indicated that' to a limited extent consumers tend to view Wonder Bread comparatively favorably on general nutritional grounds, and that some of the Wonder Bread commercials increased the product's nutritional rating among the viewers interviewed, the Administrative Law Judge found that no significant proportion of consumers understood the Wonder Bread advertisements as making any of the specific claims alleged in paragraph eight of the complaint, that any positive impact of the advertisements on viewers' attitudes had not been shown to result from nutritional claims as distinguished from a general "halo effect"[12] unrelated to nutrition, and that the challenged advertising did not in fact contain, either directly or by implication, any of the representations alleged. On appeal to the full Commission, it concluded that the evidence, at best "ambiguous" as to the subparagraph (a) allegation, did not demonstrate that the petitioners had made the specific nutritional representations alleged in paragraph eight. Both the Administrative Law Judge and the Commission also concluded that there was no proof that the advertisements had represented (as alleged in paragraph eleven) that Wonder Bread is a *necessary* food for the healthy growth of children.

With respect to the paragraph ten allegation, involving the portrayal of Wonder Bread as "an extraordinary food for producing dramatic growth in children," complaint counsel introduced, in addition to the Wonder Bread advertisements themselves, testimony by two psychiatrists and a pediatrician concerning how children perceive

---

11. In general, these studies were not conducted on behalf of the Commission but had been performed for ITT Continental for purposes not related to this litigation.

12. According to the Commission,
   "[The] halo phenomenon in essence can be defined as a general aura of superiority ascribed by consumers to a specific product or product attribute which is generated not by a particular claim in an advertisement about that product or product attribute but merely by either the fact that the product was widely used by consumers or by the fact that the advertisements made only generalized claims about the product itself or stressed an entirely different attribute." Opinion of the Commission, at 13.

and react to television commercials. These experts testified that, while a child's perception of such commercials is influenced by his parents and other external factors, children below the age of seven would generally tend to accept the "fantasy growth sequence" in Wonder Bread advertising as literal truth: i. e., they would believe that eating Wonder Bread could cause them to grow on the spot. Normal older children, between six and twelve years of age, would be more skeptical of the fantasy growth sequence and would generally reject it as a literal representation of reality, but such children would still tend to accept statements in the advertisements about the product's nutritional value and to believe that Wonder Bread has some special capacity to enhance growth. Complaint counsel witnesses also testified that the commercials shown specifically on children's programs (which lacked the fantasy growth sequence) would be particularly effective with child viewers because the commercial message was delivered by trusted figures and without a clear distinction between the content of the programs themselves and the advertisements. As for the psychological impact of the commercials, one witness testified that a young child might feel that something was wrong with him upon discovering that, unlike those in the fantasy growth sequence, he did not suddenly grow larger and taller after eating Wonder Bread. Children, especially between six and twelve, could also react by becoming mistrustful of information from adult sources. Another witness testified that some young children would be "temporarily burdened" by the puzzling portrayal of instantaneous growth.

A psychiatrist appearing on behalf of the petitioners emphasized the importance of family and other influences on children's perception of television commercials. He testified that, while a normal young child viewing the fantasy growth sequence might "hope that maybe this would happen to him", discovering that he would not in fact grow instantaneously by eating Wonder Bread would be a normal learning experience without harmful impact.

The Administrative Law Judge found, inter alia, that although some young children may perceive the fantasy growth sequence as literally true, others are skeptical; that the fantasy element in Wonder Bread commercials is "a diluted version of most normal children's fantasies" and that television contains numerous other instances of "fantastic or magical appeals"; that whether a child asks his parents to purchase an advertised product "depends more on the nature of the parent-child relationship and other factors than on the persuasiveness of the commercial to the child"; that the Wonder Bread commercials presented on children's programs contained no portrayal of Wonder Bread as an extraordinary food for producing dramatic growth; and that there was no proof of any psychological damage to children from the advertising.

The Judge concluded that complaint counsel had failed to prove any of the allegations of false, misleading, and deceptive claims, and he dismissed the complaint in its entirety.

The Commission rejected the Administrative Law Judge's conclusion concerning paragraph ten of the complaint. It found instead that "[t]he challenged Wonder Bread television advertisements represent to viewers that Wonder Bread is an extraordinary food for producing dramatic growth in children." The Commission relied principally on its interpretation of the advertisements themselves "when viewed in their entirety." It pointed to the verbal content of the commercials, which included numerous references to growth in children and the value of Wonder Bread in aiding such growth, as well as to the visual fantasy growth sequence. The Commission stated that "the inferences to be drawn from the sequence, and others, is clearly misleading, apart from whether or not most consumers would regard the literal import of the sequence with skepticism." It also concluded that the other evidence in the record was not inconsistent with its view of the challenged advertisements: experts had testified that the commercials could be perceived as representing Wonder Bread as an

extraordinary food for producing growth in children, and survey data indicated that some consumers believed Wonder Bread to be superior or exceptional in terms of helping children grow.

Since the Commission also found that in fact Wonder Bread is not an extraordinary food for producing growth in children, it concluded that the challenged advertisements were false and misleading, in violation of §§ 5 and 12 of the Federal Trade Commission Act. It declined, however, to find that the false representations additionally constituted an *unfair* act under § 5 on the theory that they exploited the aspirations of children and injured them psychologically. In the view of the majority of the Commission, any alleged injury in this case was inseparable from the falseness of the representations in question.

After the Commission handed down its opinion and order of October 19, 1973, the petitioners filed a request for reconsideration on the ground, *inter alia,* that the FTC had found a violation of the Federal Trade Commission Act on a theory which had never been alleged or advanced in the litigation, namely, that the challenged advertisements made the false growth representations not only to children but to *adults* as well. In its order responding to the petition for reconsideration, the Commission conceded that its earlier opinion had discussed the effects of the Wonder Bread commercials on adults as well as children, but it did not view that as inconsistent with the charge in paragraph ten, the thrust of which the Commission agreed was "directed to the effect of the challenged advertisements on children." It pointed out that the commercials considered in its opinion were those which were shown either on children's programs or on programs viewed by substantial numbers of children. According to the Commission, evidence that

" . . . the advertisements had the capacity to lead parents . . . to believe that Wonder Bread is an extraordinary food for producing dramatic growth in children . . . was clearly probative on the issue raised in paragraph 10, since it is reasonable to assume that advertisements which have the capacity to deceive the more sophisticated adult portion of a viewing audience would *a fortiori* have the capacity to deceive the children in that audience. We find no error in relying upon this evidence and making the findings which we did."

## II.

In their petition for review by this Court, ITT Continental and Bates argue that in finding a violation under paragraph ten of the complaint, the Commission deprived them of the notice and opportunity to be heard which are required by the Administrative Procedure Act [13] as well as constitutional due process. They point to such cases as *Stanley Works v. FTC,* 469 F.2d 498, 508 n. 24 (2 Cir. 1972), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973); *Bendix Corp. v. FTC,* 450 F.2d 534, 542 (6 Cir. 1971); and *Rodale Press, Inc. v. FTC,* 132 U.S.App.D.C. 317, 407 F.2d 1252 (1968), for the rule that "an agency may not change theories in midstream without giving respondents reasonable notice of the change." *Rodale Press, supra,* at 1256.

■ One aspect of the petitioners' claim on this point is that, while paragraph ten alleged exploitation of children's aspirations for rapid growth by falsely portraying the growth properties of Wonder Bread, the Commission did not consider the exploitation issue and found a violation merely on the basis of false representation. To the extent that this finding may constitute a variance with the pleadings,[14] it will none-

13. Section 5 of the Act, 5 U.S.C. § 554, provides, in part, that "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing . . . Persons entitled to notice of an agency hearing shall be timely informed of

. . . the matters of fact and law asserted. . . ."

14. The violation found would at worst appear to be the civil equivalent of a "lesser included offense" in relation to the paragraph ten allegation, since a false portrayal of Wonder Bread

theless be sustained because the parties charged were apprised of the issues actually at stake and in fact litigated them throughout the proceedings. *E. g., NLRB v. Mackey Radio & Telegraph Co.,* 304 U.S. 333, 349–51, 58 S.Ct. 904, 912–13, 82 L.Ed. 1381–1392–93 (1938); *National Realty & Construction Co., Inc. v. Occupational Safety & Health Review Commission,* 160 U.S.App. D.C. 133, 489 F.2d 1257, 1264 (1973); *Golden Grain Macaroni Co. v. FTC,* 472 F.2d 882 (9 Cir. 1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *Swift & Co. v. United States,* 393 F.2d 247 (7 Cir. 1968); *Curtiss-Wright Corp., Wright Aeronautical Division v. NLRB,* 347 F.2d 61, 72–74 (3 Cir. 1965); *NLRB v. Johnson, Trustee,* 322 F.2d 216, 220 (6 Cir. 1963), *cert. denied,* 376 U.S. 951, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); *Armand Co. v. FTC,* 84 F.2d 973 (2 Cir.), *cert. denied,* 299 U.S. 597, 57 S.Ct. 189, 81 L.Ed. 440 (1936). The petitioners were not prejudiced by the Commission's decision to find that the challenged advertisements were only deceptive and not unfair as well.

█ A more serious question is raised by the petitioners' claim that the Commission erred by making a finding that the Wonder Bread advertisements were deceptive to "viewers" in general, despite the fact that during the FTC litigation both sides treated paragraph ten of the complaint as charging deception of children only. There is little

doubt that the parties did so understand and litigate the charge, and the Commission does not argue otherwise. Similarly, it cannot be disputed that the Commission did in fact conclude that the Wonder Bread advertisements "had the capacity to deceive . . . parents" and not just children. The petitioners contend that they were prejudiced by the FTC's action because had they known that paragraph ten would be interpreted as charging deception of adults, they would have introduced expert testimony concerning the probable perception of the advertising by adults as well as an analysis of the survey evidence to refute the Commission's interpretation of it.

It should be borne in mind, of course, that the Commission did find the challenged advertisements to be deceptive to children, as alleged in paragraph ten. Were it not for the fact that the cease and desist order might have been based, in whole or in part, on a finding by the Commission of an additional or broader violation of the law than that alleged in paragraph ten,[15] there would be little reason to treat the challenged portions of its opinion as more than harmless surplusage.[16] By itself, the Commission's initial opinion is sufficiently ambiguous in this respect that we might have found it necessary to remand so as to ensure that the cease and desist order was based only on the "matters of fact and law asserted" and in order to afford the petitioners time

was literally alleged therein, along with an exploitation of children.

**15.** In practical terms, it may be doubted that the FTC would reach very different conclusions as to the appropriate remedial action to take on the basis of the deceptiveness to children of a group of advertisements, than it would on the basis of the same type of deceptiveness, in the same advertisements, to children *and* adults. Moreover, given the limited scope of this court's review of FTC cease and desist orders, see *infra,* it is unlikely that an order sustained on the latter basis would not also be sustained on the former. Nevertheless, the petitioners are entitled to a determination of the appropriate remedy by the Commission itself, untainted by the existence of an additional, if similar, finding of a violation against which they had no fair opportunity to defend.

**16.** Aside from the terms of the cease and desist order, the petitioners might also justifiably object to the mere entry by the FTC, without adequate notice and opportunity for a hearing, of a finding against them of an additional violation of the Federal Trade Commission Act. The actual finding made in this case, however, —that "[t]he challenged Wonder Bread television advertisements represent to viewers that Wonder Bread is an extraordinary food for producing dramatic growth in children"—states on its face a single type of representation, and the mere fact that the general term "viewers" is used does not require a modification of the finding on fairness grounds. Children are viewers too.

The petitioners further argue that the Commission erred in relying on the advertisements' effect on adults as *evidence* of the effect on children, a contention which we reject, *infra.*

to litigate the issue. 5 U.S.C. § 554. See *NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 861–62 (2 Cir. 1966). But the Commission has already had the question brought to its attention in the petitioners' request for reconsideration, and it has already set out its reasoning on this matter in its order in response thereto. It explained that it *did* view the violation under paragraph ten in terms of the advertisements' effect on *children,* and that it had looked to the evidence of their effect on adults as "probative on the issue raised in paragraph ten," on the assumption that what deceived adults would *a fortiori* deceive children.

The petitioners urge that "the opinion on reconsideration is entitled to no weight on the question presented," contending that it did nothing to remedy the procedural deficiency of the Commission's decision and that its rationale is contradicted by both the initial opinion and other portions of the opinion on reconsideration itself. They point, for example, to the Commission's reference, in the second opinion, to its power to "regulate types of claims that are reasonably related to the past representations and which might constitute alternate roads to the same general goal of deceiving the *public.*" (Emphasis added.) But the Commission's use of the term "public" rather than "children" in the context of a general statement concerning the scope of its powers, proves nothing. In any event, youthful television viewers belong to the public as much as adults. Similarly, there is nothing inconsistent with the FTC's later explanation of how it regarded paragraph ten, in the fact that in the initial opinion it considered, and *rejected,* the possibility, urged by complaint counsel, of ordering corrective advertising to benefit "consumers," or in the Commission's reference, on reconsideration, to "the importance to children and consumers of correct nutritional information." While, as appears below, we do not find the cease and desist order to be fully justified by the violation found in this case,

we see no persuasive reason to disbelieve the Commission's explanation that, *in its own view,* the violation underlying that order involved misrepresentation to *children,* as the petitioners argue it must. Nothing more is here at issue.[17]

■ The petitioners next argue, however, that even accepting the FTC's claim that the effect of Wonder Bread advertising on adults was considered only as evidence of its effect on children, reversal would still be required because such use of the evidence constitutes "a legal theory or set of facts which was not presented at the hearing." *National Realty & Construction, supra,* 489 F.2d at 1267 n. 40. But to apply the notice and hearing requirement in this manner in this case would be carrying a good thing too far. To draw a different inference from the evidence in the record than what is urged by the parties, or to find some factual import in the evidence not brought out by them, is not the same thing as relying on evidence not in the record, see *Ohio Bell Telephone Co. v. Public Utilities Comm'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), or basing liability on a legal theory of which the party found liable had no notice, see *Bendix Corp., supra. Cf. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 288 n. 4, 95 S.Ct. 438, 443, 42 L.Ed.2d 447, 457 (1974). It would be unrealistic to require the Commission to ignore what it viewed as the "inescapable" conclusion that the Wonder Bread advertisements were deceptive to adults, in reaching a determination on the closely related question of whether the advertisements were deceptive to children. Indeed, given the Commission's primary reliance on its own expertise in interpreting advertisements (a reliance shared by complaint counsel and the Administrative Law Judge), it is hard to see how the Commission could have avoided giving some consideration to adults' perception of the challenged commercials. In these circumstanc-

17. There is, of course, no inconsistency between the holding here that the Commission did not violate petitioners' right to adequate notice and the holding *infra* that the Commission erred in formulating a cease and desist order which was too broad in relation to the violation found.

es, there is no real unfairness in the Commission's reference to the capacity of Wonder Bread advertisements to deceive adults in support of its finding that the advertisements were deceptive to children.

### III.

■ The petitioners attack the FTC's finding of the violation charged by paragraph ten of the complaint as "obviously erroneous." They contend that the finding is logically inconsistent with the Commission's dismissal of the allegations that Wonder Bread was represented to be "an outstanding source of nutrients, distinct from other enriched breads" (paragraph 8(a)), and a "necessary food for . . . children to grow and develop to the fullest extent . . . " (paragraph eleven). The FTC, however, based its dismissal of paragraph 8(a) on its interpretation of that allegation, favorably to the petitioners, as representing Wonder Bread to be nutritionally superior to *all* other enriched breads, and it was unable to conclude that such a specific misrepresentation was contained in the challenged advertisements. Neither that decision, nor its decision that Wonder Bread had not been represented as *necessary* for a child's growth, is inconsistent with the finding that Wonder Bread was portrayed as an extraordinary food for producing dramatic growth in children. In any event, the petitioners' argument, which rests on the unstated premise that the advertising itself must contain only logically defensible messages, is unpersuasive. Indeed, it is fair to suppose that the commercials in question were *designed* to avoid making any *specific* nutritional misrepresentations while *at the same time* conveying the general idea that Wonder Bread would somehow significantly contribute to growth in children. That the petitioners succeeded in this subtle artifice is no defense to the FTC's order.

While recognizing that the meaning of advertising is ordinarily a matter for the Commission to decide, as long as its conclusions are reasonable, *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 386, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904, 914 (1965), the petitioners further contend that the Commission's finding in this case necessarily attributes to the consumer "not only a careless and imperceptive mind but also a propensity for unbounded flights of fancy,"—a view of consumers which this court has declared itself unwilling to adopt, *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 676 (2 Cir. 1963). Of course, there was expert testimony in the instant proceedings which declared that part of the audience in question, *i. e.* children approximately six years of age and younger, do indeed have such a propensity, and that they would actually tend to perceive commercials containing the "fantasy growth sequence" as promising that Wonder Bread could cause them to grow as suddenly as the child depicted in that sequence. With respect to the Commission's discussion of the effect of the advertising on *adults,* the petitioners' argument might be persuasive only if "dramatic growth," as used in paragraph ten of the complaint, is equated exclusively with the phenomenon of a one-year-old child reaching the size of a twelve-year-old, within thirty seconds. It is clear, though, that neither the Commission on appeal nor complaint counsel during the litigation viewed the paragraph ten allegation in such a restricted light.[18]

Although it is unfortunate that the phrase in question was not better defined, as Bates noted in its brief before this court the term " 'extraordinary' is nothing but a vivid adjective," and the same is true of the term "dramatic." The expert testimony introduced by complaint counsel dealt not only with whether children, six years of age or younger, would perceive the fantasy growth sequence as literal fact but also with whether older children, though skeptical of the sequence, would conclude from the advertisements that Wonder Bread has a special ability to aid growth. Similarly,

---

18. The Commission specifically stated that it was *not* relying solely on the fantasy growth sequence and that the deceptiveness of that sequence did not depend on consumers accepting it literally.

complaint counsel argued before the Commission that the challenged commercials were false and misleading because, *inter alia,* children below the age of six "will tend to perceive . . . the Captain Kangaroo and Bozo ads [excluding the fantasy growth sequence] as promising some special growth capacity . . . and children between the ages of approximately six and twelve will tend to perceive all the challenged television ads as promising a special growth potential which would not be available without eating Wonder Bread . . .". Hence, as developed during the FTC proceedings, the misrepresentation charged in paragraph ten encompassed more than the narrow fantasy portrayal assumed by the petitioners on this review. On the basis of a broader construction of the phrase in question, the Commission's conclusion that the commercials portrayed Wonder Bread as "an extraordinary food for producing dramatic growth in children" is substantially supported by the content of the Wonder Bread commercials themselves, with their numerous pictorial and verbal suggestions of an important causal relationship between the consumption of Wonder Bread and growth in children.[19]

The petitioners also argue that, since the fantasy growth sequence did not appear on commercials shown on children's television programs, the Commission cannot properly find the challenged advertising unlawful on the ground of misrepresentation to *children.* In the petitioners' view, "it simply is not conceivable that . . . advertising intended to reach adults can be judged unlawful simply on the basis of how it may be perceived by some very young children who happen to be in the viewing audience when it is broadcast." Such a general theory would appear to be a novel extension of the existing law, see *In re Kirchner,* 63 F.T.C.

1282, 1290 (1963), *aff'd,* 337 F.2d 751 (9 Cir. 1964). As already indicated, however, the petitioners are wrong in assuming that the advertisements shown on children's television programs were not themselves found to be misleading under paragraph ten despite their lack of a fantasy growth sequence, or that only very young children were found to be misled by accepting the sequence at face value in the advertisements which did contain it. Moreover, the latter advertisements were shown on daytime television programs "with *children* constituting a substantial part of the viewing audience," (emphasis in original) and they focused on the benefits of Wonder Bread *to children,* even using, in the "How Big" campaign, portrayals of children expressing their desires for the growth which the commercials implicitly promised would result from consuming Wonder Bread. Under these circumstances the FTC did not err in making the finding that the presentations were misleading to children.

### IV.

■ The final ground on which the petitioners attack the Commission's finding is that, under *Cinderella Career & Finishing Schools, Inc. v. FTC,* 138 U.S.App.D.C. 152, 425 F.2d 583 (1970), the Commission is not free to ignore relevant testimony in the record or the findings of the Administrative Law Judge before whom the case was tried. Although the Commission may reach a different conclusion than the latter, it must explain why—a requirement which, the petitioners contend, was not fulfilled here.

While it would have been preferable for the Commission to have commented on the Administrative Law Judge's decision in its discussion of the paragraph ten charge, an examination of his findings on this issue reveals that they contain little which con-

---

19. The petitioners also take issue with the FTC's reference to expert testimony and survey evidence in support of its conclusion. They point in particular to the example, taken by the Commission from the verbatim responses in one study, see *supra,* of the consumer who declared that one advertisement "tells you Wonder Bread helps your children grow ten feet tall." The petitioners argue that the use of

this evidence to demonstrate face-value acceptance of the fantasy growth sequence (by adults) shows the irrationality of the Commission's analysis. But as is clear from its opinion, the Commission did not rely on this or other survey or expert evidence as the basis for its decision under paragraph ten. The decision was reached primarily on the basis of the Commission's own interpretation.

tradicts the Commission's own analysis. For the most part, the Administrative Law Judge's findings relate to evidence about the perceptions and capacity for "magical thinking" of young children, which was also referred to by the Commission in its opinion and found to be consistent with its view of the challenged commercials. The Administrative Law Judge found that some young children "may perceive the filmed growth sequence in Wonder Bread television commercials as literally true . . .". Others of his findings deal with the extent to which children become skeptical of "television tricks" and magic, but the Commission specifically concluded that skepticism in viewers does not necessarily render the advertisements non-deceptive. The only finding which directly contradicts the Commission's decision is the conclusory statement that the commercials shown on children's programs did not contain the false portrayal of Wonder Bread alleged in paragraph ten, and the Commission provided an explanation of why it viewed these and the other Wonder Bread advertisements as implicitly making the alleged representation. Moreover, unlike *Cinderella, supra,* the Commission in this case did examine and consider the record developed at the initial hearing.

Under these circumstances, we hold that the Commission's failure, explicitly to discuss the Administrative Law Judge's findings regarding paragraph ten, did not render its decision-making fatally defective.

### V.

The Commission concluded that the petitioners had made representations concerning Wonder Bread which were false and misleading, and it, therefore, entered a cease and desist order against them which, in relevant part and as modified by the Commission's order on reconsideration, prohibited:

"1. [Representing:]

a. The nutritional properties of any [food] product in generalized terms such as 'rich in nutrients,' vitamins or iron fortified, 'enriched,' or other similar nutritional references, unless the advertised nutritional value can be substantiated for the average and ordinary use of the product by consumers or by particular groups of consumers provided they are specified.

b. The comparative nutritional efficacy or value of the product without stating the brand, product or product category to which the comparison is being made.

c. The essentiality of the product as a source of a particular nutritional value if there are other food product categories which are also sources of the same or similar nutritional values, and unless the claim can be substantiated for the normal use of the product by consumers or by a particular group of consumers provided that they are specified.

d. The functional value or other attributes of any [food] product to a user through the use of demonstrations or other visual techniques unless the demonstrations are actual depictions of the actual value of the product by actual persons and represent the average and ordinary experience of consumers with the use of the product.

2. [Representing] that any [food] product will contribute to the rapid or proper growth of children by providing dramatic or substantial benefits for such growth or development unless such product, by itself, will in fact make a significant contribution to such rapid or proper growth.

3. [Misrepresenting], in any manner, the nutritional content, efficacy or functional value to the user for the normal use of any [food] product by consumers."

This court has recently had occasion to reaffirm the principle that "the Commission has a wide discretion in its choice of a remedy to 'cope with the unlawful practices' disclosed by the record," *Fedders Corp. v. FTC,* 529 F.2d 1398, 1401 (2 Cir. 1976), quoting *FTC v. Mandel Bros. Inc.,* 359 U.S. 385, 392, 79 S.Ct. 818, 824, 3 L.Ed.2d 893, 898 (1959), and that "[s]o long as the remedial order is reasonably related to the unlawful practices found to exist, the Commission's order should be upheld." *Fedders, supra,* at 1402. The courts may narrow FTC orders, however, by deleting

those portions for which a reasonable relationship to the offending conduct is lacking. *Id.* In the present case, the petitioners argue, *inter alia,* that paragraphs (1) and (3) of the cease and desist order are not reasonably related to the Commission's finding that Wonder Bread was misrepresented as an extraordinary food for producing dramatic growth in children.[20] We agree.

The Commission specifically found that Wonder Bread had *not* been misrepresented as nutritionally superior to other breads, or as necessary for children's healthy growth and development, the very types of representations at which paragraphs 1(b) and 1(c) are aimed. The petitioners had not been charged with representing Wonder Bread's nutritional value in "generalized terms" (the practice regulated by paragraph 1(a)); nevertheless the Commission did *exonerate* them of several accusations concerning Wonder Bread's nutritional content. Moreover, while the petitioners had advertised another group of food products, Hostess Snack Cakes, as "fortified with vitamin and iron," "vitamin fortified," and containing "good nutrition", the Commission *dismissed* all charges relating to this advertising, including charges that the claim of "good nutrition" was misleading. It is difficult to avoid concluding that paragraphs. 1(a), (b) and (c) of the cease and desist order were framed to remedy wrongs which the Commission found not to have been committed.

■ Although as a general rule the failure of complaint counsel to prove all of the charges originally brought should not necessarily preclude the Commission from prescribing a broad cease and desist order on the basis of the violations which it does find, the exoneration of the petitioners with respect to eleven out of twelve nutritional misrepresentations charged by complaint counsel here, is at least a factor to be weighed in judging the reasonableness of an order extensively regulating the advertising of nutritional qualities in food.[21] See *National Dairy Products Corp. v. FTC,* 412 F.2d 605, 624 (7 Cir. 1969).

■ In this case, the restrictions imposed by paragraphs 1(a), (b), and (c) do not appear to be reasonably calculated to prevent future violations of the sort found to have been committed; nor indeed are the practices condemned therein necessarily deceptive in general. As Bates points out, other advertisers are allowed to do what these paragraphs prohibit the petitioners from doing: for instance, the Commission has permitted advertising in which a fruit drink was represented to be "high in Vitamin C" without reference to other products containing the vitamin and despite the fact that some other products contain more vitamin C. *Coca-Cola Co.,* 3 CCH Trade Reg. Rep. ¶ 20,470 (FTC 1973). While "those caught violating the Act must expect some fencing in," *FTC v. National Lead Co.,* 352 U.S. 419, 431, 77 S.Ct. 502, 510, 1 L.Ed.2d 438, 447 (1957), the particular burdens here are not justified by the mere fact, relied on by the Commission, that the Wonder Bread advertisements found deceptive in one respect contained various references to the product's nutritional qualities.

■ Paragraph 1(d) appears to present a closer question, since it is directed

20. The petitioners also attack portions of these paragraphs as vague, indefinite, and ambiguous. The disposition here of paragraphs 1 and 3 makes it unnecessary to consider these claims.

21. Paragraph eight of the complaint, dismissed in full, alleged representation of Wonder Bread as: an outstanding source of nutrients; a food which, as customarily used, will provide all the nutrients essential to a child's development; a product which parents can rely on to provide such nutrients; the optimum contribution a parent can make to his child's nutrition; and a source of complete high quality protein. Also dismissed were paragraph eleven, which charged portrayal of Wonder Bread as a necessary food for children's growth; paragraph thirteen, which charged the petitioners with misleading consumers by representing that the fortification of Hostess Snack Cakes was a major nutritional advance and an advance unavailable in other similar products; that Hostess Snack Cakes provide all the vitamins essential for children; and that Hostess Snack Cakes provide children with good nutrition; and paragraph fifteen, which charged false representation of Hostess Snack Cakes as necessary for children's good nutrition.

at the fantasy growth sequence which the Commission viewed as an important feature in the deceptiveness of Wonder Bread commercials. Although some form of order restricting the use of this type of technique might be justified here, paragraph 1(d) is too broad to be sustained on the basis of the Commissions's findings.[22] The scope of the phrase "demonstration or other visual technique" is "potentially limitless," *FTC v. Colgate-Palmolive Co., supra,* 380 U.S. at 380, 85 S.Ct. at 1090, 13 L.Ed.2d at 911, since every television commercial presenting other than a blank screen involves the use of some sort of "visual technique." This court fails to see how a ban on virtually any sort of televised representation of the value of food products other than "actual depictions of the actual value of the product by actual persons"—irrespective of whether the representation is misleading—bears a reasonable relationship to the finding that, in conjunction with other elements of the challenged advertisements, a particular and highly exaggerated fantasy growth sequence conveyed a false impression about the capacity of Wonder Bread to produce growth in children.

■ Paragraph 3 of the cease and desist order, which proscribes misrepresenting nutritional characteristics of food "in any manner," suffers from exactly the same defect found fatal in *Country Tweeds, Inc. v. FTC,* 326 F.2d 144 (2 Cir. 1964). There the FTC had found that the petitioners had falsely represented that independent laboratory testing showed their cashmere clothing to be superior in durability, and the Commission ordered them, *inter alia,* to refrain from "misrepresenting in any manner the quality of cashmere or other fabric in their merchandise." 326 F.2d at 148. In

striking that portion of the cease and desist order, this court stated, "It is difficult to imagine an order couched in more sweeping language than the one now before us." *Id.* at 149. In the present case, as in *Country Tweeds,* the petitioners were found to have made one sort of misrepresentation concerning certain product characteristics but were subject to an order covering *any manner* of misrepresentation. The unreasonableness of the order in the present case is underscored by the fact that the petitioners were exonerated of charges that they had made other sorts of nutritional misrepresentations than the single one found to have been committed. See also *Fedders, supra,* where this court observed that the Commission had "done the necessary limitation which reasonableness would require" in limiting the cease and desist order to representations concerning specific types of air conditioner characteristics related to the violation found, "as opposed to the administrative law judge's proscription as to 'any' performance characteristic." At 1403. Accord, *Speigel, Inc. v. FTC,* 411 F.2d 481, at 484–85 (7 Cir. 1969).

■ The petitioners also attack the cease and desist order, including paragraph 2, on several other grounds. They argue that there is no reasonable relationship between the single violation found and the extension of the order to the advertising of *any food product.* The Commission was acting within its discretion, however, in so formulating paragraph 2 of its order. Misrepresenting the growth properties of a food is a particular type of deceptive practice which the petitioners could equally well use in advertising other food products as in advertising Wonder Bread.[23] Unlike the proscriptions contained in the other paragraphs of the Commission's order, the ne-

22. Advertising containing the fantasy growth sequence ended several years ago, and ITT Continental has abandoned nutritional themes in Wonder Bread commercials, with no intention of returning to them, according to its vice president in charge of marketing and advertising. Under these circumstances, particularly in view of the already long duration of this litigation, there is little point in remanding paragraph 1(d) of the order for possible re-

working by the Commission. In so acting this court is not unmindful of, but concurs in, the general rule that voluntary cessation of an illegal practice is no bar to a Commission cease and desist order. E. g. *Country Tweeds, Inc. v. FTC,* 326 F.2d 144, 148 (2 Cir. 1964).

23. As to Bates, the Commission advanced an additional justification for covering all food products in its order: the fact that the petitioner was already subject to a number of cease

cessity or desirability of those contained in paragraph 2 are relatively independent and not called into question by the dismissal of charges that the petitioners had committed *other* types of misrepresentation. Moreover, the use of this practice by the petitioners was not restricted to an isolated instance but was found in numerous advertisements comprising two large campaigns over a number of years. In circumstances no more compelling than these courts have often upheld FTC orders encompassing all products or all products in a broad category, based on violations involving only a single product or group of products; and we do the same here. *Colgate-Palmolive, supra,* 380 U.S. at 394–95, 85 S.Ct. at 1047–48, 13 L.Ed.2d at 919–20; *National Dynamics Corp. v. FTC,* 492 F.2d 1333 (2 Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974); *Tashof v. FTC,* 141 U.S.App.D.C. 274, 437 F.2d 707 (1970); *Benrus Watch Co. v. FTC,* 352 F.2d 313 (8 Cir. 1965), *cert. denied,* 384 U.S. 939, 86 S.Ct. 1457, 16 L.Ed.2d 538 (1966); *Western Radio Corp. v. FTC,* 339 F.2d 937 (7 Cir. 1964), *cert. denied,* 381 U.S. 938, 85 S.Ct. 1770, 14 L.Ed.2d 701 (1965); *Niresk Industries, Inc. v. FTC,* 278 F.2d 337 (7 Cir.), *cert. denied,* 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960); *Consumer Sales Corp. v. FTC,* 198 F.2d 404 (2 Cir. 1952), *cert. denied,* 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953).[24]

■ The petitioners also argue that paragraph 2 is overbroad because it is not limited to representations concerning "dra-

matic" growth but also covers representations that food products contribute to "proper" growth or provide "substantial benefits" for such growth, and because it requires that any food so advertised be capable in fact of significantly contributing to growth "by itself." These elements of the order, however, are reasonably related to the violation found. "Dramatic" or "proper" growth are not markedly different variations on the same basic theme, see *Consumer Sales, supra,* 198 F.2d at 408. The phrase "by itself" does not mean here that the food product must be able to replace all other foods in one's diet; rather by this phrase the Commission properly has sought to preclude misleading claims of substantial contribution to growth merely because a food product, such as Wonder Bread, contains some of the nutrients which comprise part of a healthful diet for children.

■ Finally, the petitioners argue that the cease and desist order must be limited to advertising directed at children. But the advertising found misleading to children in this case was not restricted to commercials shown on children's programs, and there was evidence in the record that in any event advertisers are not particularly successful in focusing their "impressions" only on the target group of viewers. Since a similar growth theme in Wonder Bread advertisements was aimed at both children and adults, the Commission was justified in directing its order against the petitioners' advertising in general.

---

and desist orders concerning its advertising. But of the six orders referred to, five were consent orders which provided that they did "not constitute an admission by proposed respondents that the law has been violated." Bates is correct that the Commission may not rely on such orders as evidence of additional illegal conduct when formulating cease and desist orders in other proceedings. See *NLRB v. Local 282, Int'l Bro. of Teamsters, Etc.,* 428 F.2d 994, 1000 (2 Cir. 1970); *NLRB v. Local 926, Int. Union of Operating Eng., AFL–CIO,* 267 F.2d 418, 420–21 (5 Cir. 1959).

24. In support of their position the petitioners rely especially on *National Dairy Products Corp. v. FTC,* 412 F.2d 605 (7 Cir. 1969); *Grove Laboratories v. FTC,* 418 F.2d 489 (5 Cir. 1969); and *American Home Products Corp. v. FTC,*

402 F.2d 232 (6 Cir. 1968), cases in which Commission orders were restricted by the court to one product or narrow category of product. In *National Dairy,* however, the court noted that there was no basis for concluding that the proscribed practice would even be illegal in connection with other products, and that unless restricted, the order could reach conduct which had been specifically exonerated in the same FTC proceeding, 412 F.2d at 624. In the other two cases, the violations found, involved misrepresenting specific properties of a particular medication for a specific ailment, and the orders found objectionable, not only included any drug but also its efficacy for any purpose. In the present case, the order, to the extent that it is sustained, is considerably narrower in scope.

## VI.

 Bates contends that the Commission erred in failing to include in the cease and desist order a provision that Bates would be liable for future violations of the order only if it "knew or had reason to know" of the advertisement's falsity. Although it points to dictum in *Colgate-Palmolive, supra,* in support of the proposition that "the position of an advertising agency necessarily differs from that of the advertiser that retains it," the court is not disposed at this point to lay down a broad rule that advertising agencies are always entitled to a "knew or had reason to know" clause in FTC orders. The relative role and responsibility of advertising agencies and their clients in preparing commercials is a subject about which the Commission has a large measure of expertise and is better left to it on a case by case basis.[25] In any event, it is unnecessary further to consider the issue here because the Commission has conceded that it has no objection to the inclusion of a clause giving Bates a defense of the nature sought, if this court regards such an addition as "appropriate." Because there appears to be no reason why such a clause would be inappropriate, it is directed that the order be modified in the manner suggested by the Commission.

Paragraphs 1 and 3 of the Commission's cease and desist order are deleted and the following clause is added:

> Respondent Ted Bates and Company, Inc., shall have a defense for false advertising representations under this order where it neither knew nor had reason to know that the representations were false.

Enforcement of the order, as modified, is granted.

---

**25.** It is not inherently unreasonable to suppose that there may be occasions where, if strict liability is to be imposed at all, it is at least as justified with respect to the advertising "agency" as to the producer of the goods advertised.